UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

THALES AVIONICS, INC.,

                          Plaintiff,                    24-cv-112 (JGK)

           - against -                MEMORANDUM OPINION AND
                                            ORDER

L3 TECHNOLOGIES, INC.,

                          Defendant.
_____

JOHN G. KOELTL, District Judge:

The plaintiff, Thales Avionics, Inc., ("Thales"), a company
that specializes in aerospace manufacturing services, seeks a
preliminary injunction in aid of arbitration to enjoin the
defendant, L3 Technologies, Inc., ("L3"), a company that
develops technologies in pilot training and aviation security,
from selling L3's stake in the parties' joint venture to the
Jordan Group ("Jordan"), a non-party private equity buyer.
Currently, Thales owns 30% of Aviation Communication &
Surveillance Systems, LLC ("ACSS"), a joint venture of which L3
owns 70%. In the Limited Liability Agreement that created the
joint venture, Thales has a Right of First Refusal ("ROFR") over
any offer L3 receives for L3's 70% stake of the joint venture
(the "Disputed Share," or the "Disputed Stake"). This case
concerns whether L3 has offered to Thales a bona fide offer that
L3 received for the Disputed Stake.

On January 5, 2024, Thales filed the current complaint in which it indicated that it would seek a preliminary injunction in aid of an arbitration against L3 that would soon be filed. ECF No. 1. On January 16, 2024, Thales commenced an arbitration with the International Chamber of Commerce ("ICC") to prevent L3 from selling the Disputed Stake to Jordan. See Gonzalez Decl. ¶ 3, ECF No. 11. On January 18, 2024, Thales filed a proposed order to show cause with emergency relief, pursuant to Federal Rule of Civil Procedure 65(a), seeking a preliminary injunction in aid of the ICC Arbitration. See ECF No. 10. Thales contends that L3's sale of the Disputed Stake to Jordan violated the terms of the parties' LLC Agreement, that this sale would cause irreparable harm to Thales, and that the public interest favors a preliminary injunction staying the acquisition in order to allow the arbitral tribunal to decide whether to award effective relief. See ECF No. 14.

Because Thales has demonstrated sufficiently serious questions going to the merits of its claim, irreparable harm, and that the balance of hardships weighs decidedly in its favor, Thales's motion for a preliminary injunction in aid of arbitration is **granted**. See New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 650 (2d Cir. 2015). The Court now makes the following findings of fact and reaches the following

conclusions of law pursuant to Federal Rules of Civil Procedure 52(a)(2) and 65.

## I.

The following facts, drawn from the parties' submissions, constitute the Court's findings of fact. See Park Irmat Drug Corp. v. Optumrx, Inc., 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016) ("In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence.").[1]

## A.

The joint venture in this case is ACSS. See More Decl. ¶¶ 1, 6-7, ECF No. 12. ACSS manufactures avionic systems and products. ACSS's customers include large aircraft manufacturers, including Airbus and Boeing. See Gittsovich Decl. ¶ 5, ECF No. 35.

Thales and L3 entered into the Limited Liability Agreement ("LLC Agreement") governing ACSS in May 31, 2001. See More Decl. ¶ 4, ECF No. 12; Compl. Ex. 1, ECF No. 1 ("LLC Agreement"). Pursuant to that Agreement, L3 - the sole initial Member with one hundred percent interest - transferred a portion of its Membership Interest in ACSS to Thales. See LLC Agreement at

---

[1] Unless otherwise noted, this Memorandum Opinion & Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

Preamble.[2] L3 holds a 70% interest in ACSS and Thales holds a 30% interest in the joint venture. See More Decl. ¶ 6, ECF No. 12; Gittsovich Decl. ¶ 13, ECF No. 35.

The LLC Agreement provides that Thales has a Right of First Offer ("ROFO"). See LLC Agreement § 9.3. Thales also has a ROFR, which requires that a Member, who has signed a binding contract to sell its interest in ACSS, must provide the other Member with the opportunity to accept the terms of that offer. See id. § 9.4. The ROFR states: "[t]he Offeror shall give the Offeree Notice containing (i) the name and address of the Third-Person Offeror, (ii) the proposed price, terms and payment and other material terms and conditions of the offered Transfer, and (iii) an offer to Transfer the Offered Interest to the Offeree at the same price and upon the same terms and conditions being offered by the Third-Person Offeror." Id. § 9.4(a). Once the Offeree has been given notice, the non-selling Member has 30 days to "accept the offer to Transfer set forth in such Notice by giving Notice containing its acceptance to the Offeror." Id. § 9.4(b). If the non-selling Member "does not give the Offeror such a Notice containing its acceptance" within the 30-day period, then the

---

[2] The LLC Agreement defines "Interest" and "Membership Interest" as the member's "status as a Member," including the right to receive distributions from the company, and all other rights and obligations that come with being a member in the LLC. LLC Agreement § 1.1.

offering member may consummate the transaction within six

months. Id.

    The LLC also includes an arbitration clause:

> Any dispute or controversy arising out of or in connection
> with this Agreement or the subject matter hereof that the
> parties are not able to resolve after good faith efforts
> over a period of fifteen (15) days shall be settled by
> arbitration conducted in the Borough of Manhattan, New
> York, New York, pursuant to the arbitration rules of the
> International Chamber of Commerce ("ICC").

Id. § 15.14(a). The LLC Agreement is otherwise governed by

New York law. See id. § 15.13.

**B.**

    In approximately August 2020, L3 began integrating the

operations of ACSS with its other avionics-related business

units. See More Decl. ¶ 8, ECF No. 12. The integrated unit was

called Commercial Aviation Solutions ("CAS"). Id. In

approximately February 2023, Thales became aware of L3's

intention to divest its avionics-related business units,

including L3's 70% interest in ACSS. See id. ¶ 11, ECF No. 12.

    In approximately April 2023, Thales was offered the

opportunity to bid on L3's 70% stake in ACSS. Id. ¶ 12. On May

24, 2023, Thales and L3 entered into a Confidentiality

Agreement, pursuant to which the parties agreed to maintain as

confidential certain materials relating to L3's efforts to sell

its CAS business. Id. ¶ 13; Id. Ex. 1 ("Confidentiality

Agreement"). Thales declined to make any offer for the bundled avionic business units. Id. ¶ 14.

In approximately late June or early July 2023, L3 opened a bidding auction process for its avionic business units and invited third parties to submit bids. Id. ¶ 15. L3 asked Thales to waive its ROFO and, in exchange, Thales stated that any such waiver would not impede Thales from later exercising its ROFR on that interest, regardless of whether the third-party buyer was a competitor of Thales. Id. ¶ 16.

On August 9, 2023, Thales signed a limited acknowledgment that its ROFO would be "deemed" satisfied but reserved its ROFR to accept any third-party offer for L3's 70% interest in ACSS. See id. ¶ 17; Id. Ex. 2. Subsequent to that agreement, Thales alleged that it made "targeted requests" for information relevant to L3's bidding offers. See id. ¶ 19. Thales alleged that L3 never provided Thales with the ACSS-specific information that Thales requested. Id.

On November 21, 2023, L3Harris Technologies, Inc. — L3's sole shareholder — entered into a Share and Asset Purchase Agreement with Horizon CTS Buyer, LLC ("Horizon") for the purchase of the CAS Business, which included L3's 70% interest in ACSS. Id. ¶ 23; Id. Ex. 5.[3] Horizon is an affiliate of, and

---

[3] To avoid confusion, this Memorandum Opinion and Order uses the term L3 to refer to both L3Harris Technologies, Inc. and L3

controlled by, Jordan, a private equity firm based in New York.
See More Decl. ¶ 24, ECF No. 12.

On November 24, 2023, L3 notified Thales by letter of the
Share and Asset Purchase Agreement, stating that "[L3Harris]
shall, and shall cause [L3] to, sell the Offered Interest in
ACSS to Purchaser, subject to Thales's right of first refusal
pursuant to the LLC Agreement." Id. Ex. 5. The letter included
the Purchase Agreement, a Limited Guaranty, an Equity Commitment
Letter, and a Seller Disclosure Schedule. Id. The letter also
provided the name and address of the Purchaser and Sponsor, and
concluded by stating: "This Notice constitutes an offer by [L3]
to Transfer the Offered Interest to Thales at the same price and
upon the same terms and conditions applicable to the sale of the
Offered Interest set forth in the Purchase Agreement, on the
terms and subject to the conditions set forth in the LLC
Agreement." Id. The proposed purchase price for the Offered
Interest was $500 million, with additional earn-out payments of
$25 million, out of a total purchase price of $800 million. The
November letter did not include any purchase agreement or any

---

Technologies, Inc. – the defendant in this case. L3
Technologies, Inc. is the defendant identified in the complaint,
see ECF No. 1 ¶¶ 9-10, and the entity that signed the November
24, 2023 ROFR Notice letter, see ECF No. 12-5. L3 Technologies,
Inc. is a wholly-owned subsidiary of L3Harris Technologies, Inc.
See White Decl. ¶ 1, ECF No. 57.

terms concerning only L3's 70% interest in ACSS. Id.; More Decl.
¶ 25.

On November 27, 2023, Jordan's planned acquisition of the
avionic business units was publicly announced. Id. ¶ 27; Id. Ex.
7.

On November 29, 2023, Thales sent a letter to L3 notifying
L3 that the ROFR notice did not comply with L3's obligations
under Section 9.4(a) of the LLC Agreement. Thales alleged that
the November letter did not provide the material terms and
conditions on which Thales could exercise its ROFR, because it
did not include terms relevant to the purchase of the specific
ACSS interest. Id. ¶ 28; Id. Ex. 8. Thales requested that L3
explain the basis for the allocation of $525 million of the
total purchase price to L3's 70% interest in ACSS. Id. ¶ 29.
Thales requested a response from L3 by 5:00 p.m. on December 4,
2023. Id.

On December 4, 2023, L3 replied to Thales's letter,
contending that the November letter complied with the
requirements of the LLC, and attached a "draft standalone ACSS
Purchase Agreement that contains the same pricing and terms that
are applicable to ACSS as are in [the Purchase Agreement
attached to the November RORF Notice]." Id. Ex. 9. L3 also
included a "Membership Interest Purchase Agreement," ("MIPA"),
that maintained a price term of $500 million with a $25 million

earn-out payment for the 70% interest in ACSS. Id. ¶ 31; Id. Ex. 10.

On December 11, 2023, L3 provided disclosure schedules associated with the MIPA. Id. ¶ 34. This schedule did not provide a standalone plan for ACSS. That same date, Thales informed L3 that the belated December ROFR and MIPA still failed to provide material terms relevant to ACSS. Id. ¶ 35. On December 12, 2023, L3 reiterated its position that the November notice complied with Section 9.4(a) of the LLC Agreement. Id. ¶ 37; Id. Ex. 12. On December 13, 2023, Thales and L3 met to confer to attempt to resolve the dispute, but were unable to reach an agreement. Id. ¶ 38.

On December 15, 2023, L3 sent Thales a letter, stating for the first time that its ROFR would expire on December 24, 2023 if Thales did not deliver its acceptance to purchase L3's 70% interest by that date. Id. ¶ 39; Id. Ex. 13.

On December 20, 2023, Thales responded, disputing L3's position that Thales's ROFR would expire and requesting that L3 refrain from closing any sale of the Disputed Stake in ACSS to Jordan before the parties' dispute was resolved. Id. ¶ 40; Id. Ex. 14.

On December 27, 2023, L3 provided a letter response, declining to confirm whether it would refrain from closing

pending the parties' dispute. L3 also declined to provide a closing date in that letter. Id. ¶ 41; Id. Ex. 15.

### C.

On January 5, 2024, Thales filed the current complaint in this Court. See ECF No. 1. On January 16, 2024, Thales filed a Request for Arbitration against L3 in the ICC. See More Decl. ¶ 42; Id. Ex. 16. On January 18, 2024, Thales filed a proposed order to show cause seeking a preliminary injunction to stay the acquisition of the Disputed Stake until the dispute could be resolved through arbitration. See ECF No. 10. This Court set a schedule for briefing and argument on the motion and thereafter referred the case to a Magistrate Judge for pretrial discovery. See ECF No. 21.

On January 31, 2024, the Magistrate Judge ordered L3 to produce limited discovery, including a November 20, 2023 letter from a third-party competitor bidder ("PE Firm") and a November 1, 2023 letter from Jordan with its proposed offer. See ECF No. 41.[4] On February 2, 2024, the Magistrate Judge ordered Thales to produce written communications between Thales and the PE Firm about the joint venture. See ECF. No. 45. On February 5, 2024,

---

[4] In the course of producing this discovery, L3 maintained that it "would not describe either [the letter from the PE Firm or from Jordan] as a "final," or "non-exploratory" bid. See ECF No. 38.

Thales produced eight documents pursuant to the Magistrate Judge's Order. See ECF No. 57 ¶ 9.

Pursuant to the limited discovery order, Thales filed a declaration and enclosed a chart in its Reply. See ECF No. 50; McDonald Decl., Ex. 1, ECF No. 48. The submission by Thales disclosed that L3 had received a competing offer from the PE Firm to acquire all of CAS for ████████████, which was ████ ██████████ than Jordan's $800 million bid. Jordan's bid included not only cash but an earnout provision. The PE Firm also offered ███████████████ for the Disputed Stake, whereas Jordan allocated $525 million for the Disputed Stake. Thus, the offer that L3 did not pursue would have resulted in ███████ ████and would have valued the Disputed Stake at ███████████ ████ than Jordan's offer, which would have made it ███████ ████████ for Thales to take the offer for L3's interest in the joint venture. Conversely, the Jordan offer will be ██████████ ████████ for L3 and far more discouraging for Thales to exercise the ROFR for the portion of the joint venture that it does not own. The following chart compares the two offers:

| Bidder | Total Purchase Price | Disputed Stake | Rest of CAS Business |
|---|---|---|---|
| Jordan (including earn-outs) | $800 million | $525 million | $275 million |
| Competing Bid[2] | ████████████ | ██████ | ████ ██████ |

See Reply at 2, ECF No. 50. The letter and chart indicate
that the PE Firm allocated ██████████████ ████ ) of the total
purchase price to the 70% of the joint venture covered by the
ROFR, while Jordan allocated 66% of its total purchase price to
the ROFR interest. See McDonald Decl. Ex. 1, ECF No. 48. Thales
uses the competing bid to argue that it was not provided with a
bona fide offer to purchase the Disputed Stake in connection
with Jordan's bid, but rather with an extremely inflated price
that did not reflect the true value of the Disputed Stake.

**D.**

On February 26, 2024, this Court heard argument on Thales's
motion for a preliminary injunction. Neither party sought an
evidentiary hearing. In subsequent correspondence, Thales
limited its request for a preliminary injunction to a stay of
the sale to Jordan until the ICC Arbitration concluded, or an
interim decision was issued by the arbitrators to cancel or
modify the Court's stay, and agreed that the stay would expire
by ██████████████ ████ – the closing deadline under L3's purchase
agreement with Jordan. See ECF No. 60.

**II.**

The Court reaches the following conclusions of law. The
district court has jurisdiction to issue a preliminary
injunction pending arbitration, see Blumenthal v. Merrill Lynch,
Pierce, Fenner & Smith, Inc., 910 F.2d 1049, 1052-53 (2d. Cir.

12

1990), and the standard for a preliminary injunction in aid of arbitration is generally the same as the standard for preliminary injunctions in other contexts. See Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co., 749 F.2d 124, 125-26 (2d Cir. 1984)(per curiam).

To succeed on its motion for a preliminary injunction in aid of arbitration, Thales must show: "(1) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction." Benihana, Inc. v. Benihana of Tokyo, LLC, 784 F.3d 887, 895 (2d. Cir. 2015); see also Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund, Ltd., 598 F.3d 30, 38 (2d. Cir. 2010)(finding that the "serious questions" standard applies to a motion for a preliminary injunction to enjoin arbitration). At this stage, it is enough to demonstrate "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Citigroup Glob. Mkts., 598 F.3d at 35.

13

A preliminary injunction in aid of arbitration "preserve[s] the status quo pending arbitration," and prevents arbitration from "becom[ing] a 'hollow formality' if parties are able to alter irreversibly the status quo before the arbitrators are able to render a decision in the dispute." Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, 910 F.2d at 1053. "[T]he expectation of speedy arbitration does not absolve the district court of its responsibility to decide requests for preliminary injunctions on their merits." Am. Exp. Fin. Advisors Inc. v. Thorley, 147 F.3d 229, 231 (2d Cir. 1998).

## A. Merits

Thales initiated an ICC Arbitration, asserting claims arising under the LLC Agreement, including breach of contract based on L3's failure to comply with Section 9.4, and in the alternative, for breach of the implied covenant of good faith and fair dealing based on L3's failure to provide a bona fide offer and purchase price to satisfy the ROFR. At the very least, both claims present serious questions as to the merits, and the balance of hardships tips decidedly in Thales's favor. See R Squared Glob., Inc. v. Serendipity 3, Inc., No. 11-cv-7155, 2011 WL 5244691, at *7 (S.D.N.Y. Nov. 3, 2011) (granting preliminary injunction where "the record demonstrates that there is a serious question—and serious doubt—that [the defendant] afforded

[the plaintiff] the proper cure period before terminating [the contract]."").

### i.  Contractual Claim

Under New York law, the elements of a claim for breach of contract are (i) the existence of an agreement; (ii) performance by the plaintiff; (iii) breach of contract by the defendant; and (iv) resulting damage. Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004); see Tagare v. Nynex Network Sys. Co., 921 F. Supp. 1146, 1149 (S.D.N.Y. 1996). In this case, the LLC Agreement between Thales and L3 is a valid and enforceable contract and Thales satisfied its contractual obligations under that Agreement. The record raises serious questions regarding whether L3 breached the Agreement by failing to comply with the ROFR provision set forth in Section 9.4, see, e.g., McDonald Decl. Ex. 1, ECF No. 48-1, and therefore whether Thales will be irreparably harmed if the sale of L3's 70% interest in the joint venture to Jordan is permitted to close.

Under New York law, a ROFR is "an agreement that should the owner receive a bona fide offer to purchase the property during the term of the option, he or she will not accept the offer without giving the holder of the right of refusal the right to buy it on the same terms." Clifton Land Co. LLC v. Magic Car Wash, LLC, 86 N.Y.S.3d 233, 235 (App. Div. 2018). Therefore,

15

"the factual question of whether there was a bona fide offer [for the Disputed Stake] is the legal pivot point of this case." Burzynski v. Travers, 636 F. Supp. 109, 112 (E.D.N.Y. 1986), aff'd without opinion, 833 F.2d 1002 (2d Cir. 1986).

Thales's allegations that L3 did not present it with a bona fide offer establish – at the very least – serious questions, for

> The 'bona fide' ensures that there really is an offer to be matched, and . . . prevents a third-party offeror selecting an amount solely to defeat the right of first refusal. This concern is especially a matter of attention in package deals . . . where the property subject to the purchase right is included within a greater package.

In re Adelphia Commc'ns Corp., 368 B.R. 348, 353 (Bankr. S.D.N.Y. 2007). Thales argues that the alleged price for the Disputed Stake, which was subject to the ROFR – namely $525 million (including earn-outs) – was not a bona fide offer for that property, but rather was artificially increased to discourage Thales from exercising its ROFR or to overcharge Thales if Thales exercised its ROFR to purchase the remaining 70% of the joint venture. The November 20, 2023 letter from the PE Firm suggests that L3's interest in the Disputed Stake was overvalued in the "package deal" with Jordan to frustrate Thales's ability to exercise its ROFR. See McDonald Decl. Ex. 1, ECF No. 48-1. At the hearing to show cause, L3 provided no explanation for why it would sell its entire interest in the

16

avionics business to Jordan for ██████████ than the competing bid from the PE Firm, or how the competing bidder could have valued the Disputed Stake ██████████ than Jordan valued it. Instead L3 asserted that the letter from the PE Firm was "not an actionable bid. It's a concept." Hearing Tr. at 37. But even assuming the November 20, 2023 letter is not a formal bid, the PE Firm plainly states:



ECF No. 48-1 (emphasis added). Meanwhile, L3 allegedly agreed to sell the Disputed Stake in ACSS to Jordan for $525 million. See ECF No. 12-5 at 3. This discrepancy between the PE Firm's and Jordan's valuations of L3's interest presents, at the very least, a sufficiently serious question as to the merits of Thales's claim that L3 breached the LLC Agreement by failing to present a bona fide offer to Thales to purchase the Disputed Stake before L3 sold that Share to Jordan.

ii.  **Implied Covenant Claim**

In New York, "[a] party may be in breach of its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations." Chase Manhattan Bank, N.A. v. Keystone Distributors Inc., 873 F. Supp. 808, 815

(S.D.N.Y. 1994); see also Don King Prods., Inc. v. Douglas, 742
F. Supp. 741, 767 (S.D.N.Y. 1990) ("The covenant is violated
when a party to a contract acts in a manner that, although not
expressly forbidden by any contractual provision, would deprive
the other of the right to receive the benefits under their
agreement.").

In this case, Thales has presented evidence of a serious
question that, at minimum, the sale of the CAS business was
structured in a way designed to circumvent Thales's contractual
ROFR on the Disputed Stake. The record developed thus far raises
a serious question that L3 allocated an inflated price to the
Disputed Stake, which would have discouraged Thales from
exercising its ROFR. See Reply at 2, ECF No. 50; McDonald Decl.
Exs. 1-2, ECF Nos. 48-1,2. This evidence raises serious
questions going to the merits of Thales's claim that L3 deprived
Thales of the rights to receive the benefits of the LLC
Agreement.

· · ·

In addition to presenting sufficiently serious questions
going to the merits of the parties' dispute, the balance of
hardships tips decidedly in Thales's favor. See R Squared Glob.,
Inc., 2011 WL 5244691, at *8. Granting Thales's motion for
injunctive relief maintains the parties' existing obligations

under the LLC Agreement and maintains the status quo pending a decision by the arbitrators.

There is no likelihood of harm to L3 from an injunction that maintains the status quo until the arbitrators have had an opportunity to decide the dispute, or at least to decide an application for emergency relief. The acquisition by Jordan is only required to close in ███████████. There is ample time before then for the arbitrators to decide this dispute whether on an interim or final basis. Based on the substantial harm Thales faces if Jordan acquires L3's interest before the arbitrators have had an opportunity to determine the merits of Thales's claims, and the negligible harm L3 might incur given the pendency of the arbitration, the balance of equities tips decidedly in favor of granting emergency relief. See Benihana, Inc., 784 F.3d at 897.

## B. Irreparable Harm

"[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction . . .." Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990). "Irreparable harm must be shown by the moving party to be imminent, not remote or speculative, and the alleged injury must be one incapable of being fully remedied by monetary damages." Id. A company's "loss of reputation, good will, and business opportunities" from a breach of contract can

19

constitute irreparable harm. Register.com, Inc. v. Verio, Inc.,
356 F.3d 393, 404 (2d Cir. 2004). Moreover, the loss of the
right to have a dispute decided by arbitration when arbitration
is the agreed upon means of resolution is itself an irreparable
injury. Credit Suisse Sec. (USA) LLC v. Ebling, No. 06-cv-11339,
2006 WL 3457693, at *3 (S.D.N.Y. Nov. 27, 2006) (finding
irreparable harm and preliminary injunction warranted where
"[w]ithout a preliminary injunction, the harm that Petitioner
seeks to address via arbitration will occur before the
arbitrator can render a decision, and Petitioner will lose its
right to meaningfully resolve these [] disputes via
arbitration.").

        In this case, Thales has made a strong showing that it will
suffer irreparable harm absent emergency relief. If L3 is not
preliminarily enjoined from selling its 70% interest in ACSS
until the arbitral tribunal can issue its award, there is
nothing to prevent L3 from closing the acquisition by Jordan and
thereby depriving Thales of its ROFR. While L3 argues that it
still must obtain regulatory approvals for the acquisition,
there is no assurance when those approvals will be obtained. The
loss of the ROFR cannot be quantified with money damages. See
Fairy-Mart v. Marathon Petrol. Co., No. 17-cv-1195, 2017 WL
5140514, at *6 (D. Conn. Nov. 6, 2017) (granting preliminary
injunction, explaining that if sale of gas station premises in

20

violation of statutory ROFR were not preliminarily enjoined, plaintiffs would be "forever deprive[d]" of their ROFR and calculating damages would be "highly uncertain"); Asa v. Pictometry Int'l Corp., 757 F. Supp. 2d 238, 244 (W.D.N.Y. 2010) ("[T]he point of [an injunction in aid of arbitration] is to restore the status quo ante, so that arbitration can remain a meaningful exercise.").

Thales's showing of irreparable harm is further supported by the nature of the ACSS business and the LLC Agreement, which provides that the non-breaching member "would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that monetary damages would not provide an adequate remedy in such event," and, therefore, "the non-breaching Members shall be entitled to injunctive relief to prevent breaches of this [LLC] Agreement and specifically to enforce the terms and provisions hereof." Compl. Ex. 1, LLC Agreement § 15.17. "[U]nder [Second Circuit] precedent[,] such an irreparable harm provision in the parties' agreement, while not controlling, is relevant evidence that can help support a finding of irreparable injury." Benihana, Inc., 784 F.3d at 896.

L3 argued that Thales waited too long to bring its motion for a preliminary injunction, because it knew about Jordan's offer in November 2023, but waited until mid-January 2024 to

bring its request for a preliminary injunction. <u>See</u> Mem. of Law
in Opp'n at 17-18, ECF No. 32. But that is no reason to deny the
motion for a preliminary injunction. The purpose of the motion
is to stay the Jordan acquisition until the arbitration panel
has had an opportunity to decide the merits of this case
including any application for preliminary injunctive relief, and
the arbitral panel has not even been fully constituted yet. This
is not a case where the plaintiff has been prepared to live with
the allegedly irreparable injury for an unreasonably long period
of time. Nor is it relevant that Thales filed its complaint to
support the injunctive relief and then filed its order to show
cause for a preliminary injunction thirteen days later. <u>See</u> <u>SI</u>
<u>Handling Sys., Inc. v. Heisley</u>, 753 F.2d 1244, 1264 (3d Cir.
1985) ("We do not . . . think it is important whether the movant
considered a preliminary injunction necessary at the time of
filing the complaint. The relevant inquiry is whether the movant
is in danger of suffering irreparable harm at the time the
preliminary injunction is to be issued.").

L3's apparently inconsistent argument that the motion for a
preliminary injunction is premature is equally incorrect. L3
argues that there is no imminent irreparable injury because the
acquisition by Jordan cannot close until various preconditions
are met, including regulatory approvals, and the pre-conditions
may take months to satisfy. <u>See</u> More Decl., ECF No. 12-15 at 2;

22

White Decl. ¶ 6, ECF No. 33; Gittsovich Decl. ¶ 21, ECF No. 35;
Hearing Tr. 4-5. But there is no assurance when the pre-
conditions will be met and L3 has refused to stay the closing of
the acquisition until the arbitrators have had an opportunity to
determine the merits of the arbitration or at least to decide a
preliminary injunction. See Alcatel Space, S.A. v. Loral Space &
Commc'ns Ltd., 154 F. Supp. 2d 570, 584-85 (S.D.N.Y. 2001)
("[P]laintiffs need not wait until a transaction is nearly
consummated prior to seeking injunctive relief," when the
plaintiffs have demonstrated that "irreparable harm is imminent
and real.")(emphasis in original).

### C. Balance of Hardships and Public Interest

Finally, Thales has made a strong showing that the balance
of equities tips decidedly in its favor and that an injunction
is in the public interest.

In determining whether the balance of equities tips in
Thales's favor and whether granting the preliminary injunction
would be in the public interest, the Court "must balance the
competing claims of injury and must consider the effect on each
party of the granting or withholding of the requested relief, as
well as the public consequences in employing the extraordinary
remedy of injunction." Yang v. Kellner, 458 F. Supp. 3d 199, 216
(S.D.N.Y. 2020), aff'd sub nom. Yang v. Kosinski, 805 F. App'x

63 (2d Cir. 2020), and aff'd sub nom. Yang v. Kosinski, 960 F.3d
119 (2d Cir. 2020).

For the reasons discussed above, both the balance of
equities and the public interest favor granting the preliminary
injunction. Granting the preliminary injunction will preserve
the status quo pending a decision in the ICC Arbitration. In the
absence of a preliminary injunction, there is a realistic danger
that Thales will lose its contractual right to match a bona fide
offer for L3's interest in ACSS before the arbitral tribunal is
able to issue a decision, thus rendering meaningless the
parties' agreement to arbitrate this dispute. L3 will not be
harmed by the preliminary injunction, because L3 need not close
its sale until ███████████ ███, by which time the parties
expect to have a decision by the arbitrators.

At the argument on the preliminary injunction, L3 conceded
that the only harm caused by the preliminary injunction is the
"overhang of being enjoined" while "running a business," see
Hearing Tr. 50, which would occur in any event because Thales
has the ability to seek a preliminary injunction from the
arbitrators. Moreover, granting the preliminary injunction would
not delay L3 from moving forward with obtaining necessary
regulatory approvals and would not postpone the closing date of
the acquisition.

Issuance of a preliminary injunction is also in the public interest because preserving the arbitrators' ability to order effective relief will further "the well-established federal public policy in favor of arbitration." See Telenor Mobile Commc'ns AS v. Storm LLC, 584 F.3d 396, 410 (2d Cir. 2009). Moreover, the parties agreed to this form of relief in Section 15.14 of the LLC Agreement. Granting the preliminary injunction will preserve the status quo, so that the arbitrators can decide the outcome with access to a full record.

## CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically addressed above, the arguments are either moot or without merit. For the foregoing reasons, the plaintiff's motion for a preliminary injunction in aid of arbitration is **granted.**

Thales should submit a proposed preliminary injunction within three days. L3 may submit any objections three days thereafter.

The Clerk is respectfully directed to close ECF No. 10.

SO ORDERED.

Dated:     New York, New York
           February 22, 2024

                                    John G. Koeltl
                                    United States District Judge